# UNITED STATES BANKRUPTCY COURT

## IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JAWAD HASHIM, | Chapter 7 Proceedings |
| Debtor. | Case No. 94-09453-PHX-CGC |
| SALWA AL-RUFAIEE, | Chapter 7 Proceedings |
| Debtor. | Case No. 94-09454-PHX-CGC |
| OMAR HASHIM, | Chapter 7 Proceedings |
| Debtor. | Case No. 94-09455-PHX-CGC |
| JAFAR HASHIM, | Chapter 7 Proceedings |
| Debtor. | Case No. 94-10028-PHX-CGC |
| ARAB MONETARY FUND, | (Jointly Administered) |
| Plaintiff, | (This pleading relates to Jafar Hashim and Jawad Hashim) |
| v. | Adversary No.96-668 |
| JHH CANADIAN CAPITAL CORPORATION, JAFAR HASHIM, JAWAD HASHIM, MARYAM SALASS, ALI SALASS, 1954933 NOVA SCOTIA LIMITED, 1954920 NOVA SCOTIA LIMITED, and WESTFALEN BANK INTERNATIONAL S.A. LUXEMBOURG, | MEMORANDUM DECISION (FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO BANKRUPTCY RULE 7052) |
| Defendants. | (Under Advisement Ruling) |
| and | |
| MARK HASHIMOTO, solely in his capacity as Trustee for the estate of Jafar Hashim, and LOUIS A. MOVITZ, solely in his capacity as Trustee for the estate of Jawad Hashim, | |
| Defendants and Parties in Interest. | |

# I.    INTRODUCTION

This is the last of the adversary proceedings brought by the Arab Monetary Fund ("AMF") to recover funds owed the AMF by Dr. Jawad Hashim ("Dr. Hashim"). Dr. Hashim was found guilty in a United Arab Emirates proceeding of embezzlement, forgery, and breach of trust, resulting in a judgment against him, and in favor of the AMF, of over $80 million. An English proceeding subsequently resulted in a 500 page ruling tracing millions of AMF monies to Dr. Hashim and resulting in a $50 million judgment against Dr. Hashim.

This adversary proceeding primarily concerns the proceeds from the sale of the Don Mills Bowl Shopping Centre in Ontario, Canada ("Don Mills") and approximately C$511,451 in proceeds from the sale of Suite 803, Rosehill Avenue in Toronto, Canada ("Suite 803"), properties the English Court earlier found to have been procured using funds Dr. Hashim embezzled from the AMF.

The claims that were tried before this Court are for Fraudulent Misrepresentation and Fraudulent Conspiracy[1] against the remaining Defendants JHH Canadian Capital Corporation ("JHH"), Dr. Hashim, Jafar Hashim ("Jafar"), Maryam Salass, and Ali Salass.[2] According to the AMF, Jafar, Dr. Hashim, Maryam Salass, and Ali Salass intentionally made false and material misrepresentations to the AMF with the intent, and in reasonable contemplation, that the AMF would act upon those false representations and that the AMF did in fact rightfully rely on those false representations, without knowing of their falsity, resulting in material damage to the AMF. The AMF further contends that JHH, Jafar, Dr. Hashim, Maryam Salass, and Ali Salass engaged in a conspiracy to conceal these transactions from the AMF in order to perpetuate the alleged fraudulent transfers and conveyances.

Trial on these claims began in September and concluded in December, 2004. Closing briefs

_____

[1]The misrepresentation claims are set forth in Counts I and II and the conspiracy claims in Counts VII and VIII. Counts III through VI were dismissed in 1998 as not personal to the AMF.

[2]Originally named as defendants in this case, 1954933 Nova Scotia Limited ("Nova Scotia 933" or "NS 933") and 1954920 Nova Scotia Limited ("Nova Scotia 920" or "NS 920"), have since had default judgment entered against them.

1  were filed by the end of March, 2005, and closing arguments concluded in late April, 2005. [3]

2  **II.     FACTS**

3      In an effort to simplify the facts and understand what facts the parties agree to and those they

4  do not, the Court will describe the various parties and entities involved in this dispute and provide

5  a summary of what is disputed and undisputed.

6      **A.     The Defendants**

7      Dr. Hashim filed for Chapter 7 relief on October 24, 1994.  He has waived his right to a

8  bankruptcy discharge.  His son, Jafar, filed for Chapter 11 relief on November 10, 1994.  This Court

9  subsequently denied Jafar's bankruptcy discharge.   Maryam Salass is Jafar's wife, and Ali Salass

10  is Jafar's brother-in-law.  Neither Salass has filed for bankruptcy protection.

11      Defendant JHH is an Ontario, Canada corporation originally incorporated on March 13,

12  1986, as 658944 Ontario, Inc., all the stock of which was scheduled as an asset in Jafar's bankruptcy

13  estate.   Originally, Jafar and Salwa Al Rufaiee ("Salwa"), Jafar's mother and the wife of Dr.

14  Hashim, were listed as its only directors and Jafar as its secretary, Salwa as its president, and Dr.

15  Hashim as its vice-president.  On January 15, 1987, Salwa was removed as director and president.

16  Jafar then became the sole shareholder and director and, in addition to remaining JHH's secretary,

17  also became its president.

18      Defendants allege that Dr. Hashim was also removed as vice-president of JHH on January

19  15, 1987, and had no further involvement with JHH.  The AMF disagrees and suggests in fact that

20  Dr. Hashim never was removed and was actively involved in the various transactions at issue.  They

21  all agree, however, that 658944 Ontario, Inc. was subsequently renamed JHH Canadian Capital, Inc.

22  in November, 1987.

23      **B.     The AMF Property:  Don Mills Bowl Shopping Centre and Suite 803**

24      The parties agree that the funds at issue here are from the sale of Don Mills Bowl Shopping

25  Centre and Suite 803, both of which the English Court determined were purchased with funds

26

27  _____

28      [3]This memorandum decision constitutes the Court's findings of fact and conclusions of law as
required by F.R.B.P. 7052.

misappropriated from the AMF.

In 1984, Dr. Hashim signed an agreement to purchase Don Mills. The property was allegedly purchased in trust for the Rosehill Trust and three other trusts controlled by Nezhet Tayeb. The property was sold in 1986 for nearly C$8.6 million, netting approximately C$5,056,687. The English Court concluded that the purchase was funded, in part, from funds embezzled from the AMF, which also meant that at least a portion of the proceeds from the sale of the Don Mills was AMF property. The proceeds from the sale were deposited into a variety of accounts, a portion of which the AMF alleges eventually made its way to Jafar and JHH.

Suite 803 was purchased in 1983 for C$975,000 with funds the English Court concluded were misappropriated from the AMF. In 1986, Salwa Hashim sold Suite 803 and netted approximately C$1.35 million, of which she deposited C$1.25 million in an account with the Bank of Tokyo in Toronto in her and Jafar's names, C$30,000 in another Bank of Tokyo account in Jafar's and her names, and C$70,000 in her personal account with Toronto-Dominion Bank. From the C$1.25 million deposited with the Bank of Tokyo in Toronto, Salwa says she used C$490,000 to purchase a Toronto apartment for her son Omar Hashim and C$511,451 was given to Jafar as capital for JHH.

### C.    JHH's Purchases

At bottom, the AMF alleges that "JHH was capitalized and used as a conduit whereby funds under the control or direction of Dr. Hashim and Jafar Hashim, including funds misappropriated by Dr. Hashim from the AMF, could be invested in real property and other investment ventures without detection by the AMF or other creditors." In addition to the C$511,451 everyone agrees was contributed to JHH by Salwa, the AMF contends that JHH received other monies that are traceable to Dr. Hashim and the Don Mills proceeds and, therefore, by definition, to the AMF. In particular, the AMF says JHH received shareholder advances in 1987 and 1988 totaling C$280,545, and that those funds came from proceeds from the sale of Don Mills that had been deposited into an account with Toronto Dominion Bank. The AMF also states, and Defendants admit, that JHH received C$1.5 million from Landglaze Holdings SA ("Landglaze"), funded by three separate checks on October 4, 1998 in the amount of C$220,000, October 26, 1988 in the amount of C$800,000, and

November 28, 1988 in the amount of C$480,000. JHH listed these amounts on its books as a loan ("Landglaze loan"). In addition, the AMF contends that JHH received a loan from TWH Management, Ltd. ("TWH") of C$522,000. The AMF contends that both the Landglaze and TWH loans are also traceable to the sale of the Don Mills property.

The parties diverge on the formation and funding of JHH. According to Defendants, Jafar took over JHH in order to start his own real estate investment company under which all properties registered in the name of JHH would be held in trust for various investors, including himself and his brother Omar. JHH's remuneration would come through management fees and commissions. In such a role, JHH purchased several properties in its name, but all of which Defendants represent were actually held in trust for others: St. Luc, Chambly, Charlemagne, Chambly 2, and Duke & William. A short discussion of the purchase of each property follows shortly.

Except for St. Luc and Chambly, Defendants deny that any of the funds used to purchase these properties came from Dr. Hashim. For example, Defendants state that the C$1.5 million loan from Landglaze was really an advance by Landglaze to enable JHH to purchase properties in trust for Landglaze. Defendants explain the transactions in this way: The two properties actually purchased were Chambly 2 and Duke & William. Defendants contend that the advance was treated as a loan on JHH's books to minimize Landglaze's capital gain tax exposure. The balance of funds advanced exceeding the purchase price of the two properties, approximately $448,000, was returned to Landglaze by JHH by way of two certified checks in the amount of $300,000 and $148,000 according to Defendants. The C$522,000 from TWH was not for JHH, but instead for HT, another entity Jafar solely controlled and through which Landglaze invested in another property known as Yonge & Gamble.

The AMF challenges Defendants contention that all these properties were held in trust for third parties, arguing that JHH's internal records in 1988 list these properties as assets of JHH and no one else, in the following amounts:

| | |
|---|---|
| Yonge & Gamble | $348,000.00 |
| Chambly | $291,844.72 |
| St. Luc | $247,551.22 |
| Charlemagne | $ 92,279.14 |

| | |
|---|---|
| Chambly 2 | $199,945.45 |
| Duke & William | $785,462.00 |
| Total | C$1,965,082.53 |

The AMF says the value of these properties is listed even higher, at C$2,736,693, in JHH's 1988 Financial Statements.

### (1) St. Luc

JHH purchased, for approximately C$250,000, a piece of property in March or April, 1988, referred to as St. Luc. Defendants contend that JHH held the property in trust for Jafar and was purchased using the proceeds from the sale of Suite 803 that Salwa had contributed to JHH.

The parties agree that St. Luc was subsequently sold to Nova Scotia 933 in January, 1990, for C$260,000 with the proceeds deposited in JHH's Bank of Tokyo account. Ultimately, the AMF received this property by way of its default proceedings against NS 933.

The AMF argues that NS 933 transferred a portion of St. Luc back to JHH in May, 1991, in exchange for $45,000. Defendants argue that this "occurred solely to correct the legal description" of the property.

### (2) Chambly[4]

In two separate transactions, between March and April, 1988, JHH also purchased a 50% interest in a piece of property referred to as Chambly. How much this 50% interest cost is unclear from the parties' briefs. In the Joint Pretrial Statement, the AMF says JHH's books reflect a purchase price of C$199,945.45: Defendants say JHH paid approximately $291,844.72 by check from JHH's account at Toronto Dominion Bank. In the AMF's Post-Trial Brief, it says JHH paid C$289,213,[5] but then indicates later in the same paragraph that JHH's cash flow indicates it used C$291,219 of the money Salwa contributed to JHH to pay for the property. Regardless of the cost, Defendants maintain that JHH held this property in trust for Jafar.

Everyone agrees that JHH subsequently transferred this 50% interest to Nova Scotia 933 in

---

[4]Chambly is also referred to sometimes by the parties as Chambly I.

[5]The AMF's expert, Stephen Clarke, also indicates in his report that JHH paid $289,213.

July, 1989, although Defendants contend it was not simply a transfer, but was in fact a sale to NS 933 for C$321,691.20, which was deposited in JHH's Bank of Tokyo account. The AMF acknowledges that JHH's accounting records show the sale at $322,000, but contends that the sale price was really only C$1 and "other good and valuable consideration."

The other 50% interest was apparently owned by 156558 Canada, Inc. and Fares Trading Company. These two halves, as later owned by NS 933 and 156558 Canada, Inc. and Fares Trading Company, were separated such that parcel A was solely owned by NS 933, which the AMF received by way of default against NS 933.

According to Defendants, JHH's purchase of St. Luc and the 50% interest in Chambly equaled $541,219.23, just over the $511, 451 the AMF is seeking as proceeds from the sale of Suite 803.

### (3) Charlemagne

In August, 1988, JHH bought a 25% interest in a property called Charlemagne. The parties appear to agree that the purchase of Charlemagne was a joint venture with 779993 Ontario, Inc., through Atta Hussain, and 156558 Canada, Inc., through George Kattar, with these two entities holding the other 50% and 25% interests respectively. The parties agree that all three subsequently transferred their interests in Charlemagne to 2626-0281 Quebec, Inc. ("2626 Quebec") in September, 1988.

Defendants contend JHH purchased the quarter interest for $92,000 and held it in trust for Nuha Moubark. According to Jafar, JHH's purchase of the 25% interest was funded by two disbursements received from Nuha Moubark, one on July 22, 1988 for $10,000 and one on August 18, 1988 for $82,246.

The AMF disputes that the property was held in trust for Nuha Moubark, pointing out that despite the property's transfer to 2626 Quebec, JHH listed this property as an asset in 1988, 1989, and 1990 with respective values of C$92,000, C$93,000, and C$94,000. The AMF also contends that Jafar is listed on 2626 Quebec's corporate filing in November, 1994, as its president.

### (4) Chambly 2

In October, 1988, JHH purchased a 50% interest in a piece of property known as

Chambly 2. The purchase price for the entire property was C$778,883.76, C$400,000 in cash and C$378,838 financed at 10% and due in October, 1990. The other 50% owner was 779993 Ontario, Inc., controlled by Atta Hussain.

Defendants say JHH purchased the 50% interest in trust for Landglaze and that JHH's share of the cash portion of the purchase price was C$199,945, which was paid from $220,000 Landglaze advanced on October 4, 1988. The AMF appears to agree that the purchase was funded (in the amount of C$185,000) from a portion of the Landglaze advance.

The property was subsequently transferred to Nova Scotia 920 in July, 1989, along with JHH's interest in Duke & William, with NS 920 assuming JHH's 50% share of the $378,838 mortgage, although the AMF says the transfer was only for C$1 and "other good and valuable consideration." According to the AMF, the property was foreclosed on in March, 1995, and judgment entered declaring 156558 Canada Inc. and Fares Trading the owner of the property as a result of NS 920's default.

(5) Duke & William

In November, 1988, JHH bought a 50% interest in a piece of property known as Duke & William. The other half interest was purchased, again, by 779993 Ontario, Inc. The total purchase price was C$2,675,000, of which C$1,675,000 was paid in cash and the remaining C$1,000,000 financed at 9% interest and fully due in November, 1990. Defendants again say the property was purchased in trust for Landglaze.

The parties appear to agree that the cash portion of the payment was funded by the C$800,000 advanced to JHH by Landglaze in October, 1988. While perhaps not material, Defendants represent that JHH's portion of the cash purchase price was $785,462.76, whereas the AMF suggests it was C$831,463, which would be half of the total cash portion of C$1,675,000. The AMF also contends that the original deposit on the property of C$100,000 was made by Alico Management Limited ("Alico") in September, 1988, and which Dr. Hashim reimbursed half on behalf of JHH from the Rosehill Trust, which the English Court had earlier determined was funded

- 8 -

by AMF monies.[6] According to the AMF, Jafar also reimbursed $50,000 in two separate payments from the Rosehill Trust Account.

The entire property was subsequently transferred to NS 920 in July, 1989, along with JHH's 50% interest in Chambly 2. NS 920 assumed JHH's share of the $1,000,000 mortgage. The AMF contends that NS 920 and 933 Ontario, the owner of the other 50% interest, defaulted on the mortgage, and in 1991, NS 920 paid C$538,605 to settle its obligation, which the AMF says came from the Landglaze advance. Defendants characterize the payment a little differently, saying that Edward Shami, on behalf of Landglaze, wired approximately $550,000 from its Ifabanque account to NS 920's account at Toronto-Dominion, of which NS 920 then paid $538,605 to 2629-4207 Quebec, Inc. as part of its 50% share of the seller financed carry-back note.

In September, 1995, Duke & William was sold to Sciroco Holding, Inc. for $360,000.[7] In November, 1995, NS 920 transferred $150,000 in proceeds from the sale of Duke & William to Landglaze's account at Westfalen Bank. Jafar contends that JHH did not receive any portion of the sales proceeds and that he had no connection with Sciroco.

**D.  HT Canadian Capital Corporation**

The parties agree that in March of 1987, HT Canadian Corporation was incorporated by Dr. Hashim and others, the "others" being not entirely clear from the record, but perhaps Jack Sabounji, Nezhet Tayeb, and/or Barry Papazian. At the time, the officers and directors of HT were Nezhet Tayeb (director and chairman of the board), Jack Sabounji (director and secretary/treasurer), and Dr. Hashim (director and president).

Defendants contend that HT was a dormant company until Jafar acquired it in November, 1988, and became its sole director, president and secretary. All other officers, directors, and shareholders were removed at that time and had no involvement in HT going forward. According to Defendants, HT was to be another real estate investment vehicle for Landglaze for tax purposes

---

[6]If, in fact, a $100,000 deposit was made, this would reduce the cash portion of the sale such that JHH's half would be $787,500 – closer to the $785,462.76 Defendants say JHH paid.

[7]In the parties joint pretrial statement, they agree the property was sold for $360,000. However, in the AMF's post trial brief, it lists the sales price at C$373,326.

- 9 -

and at all times HT acted for and on behalf of Landglaze.   HT was the entity of record holding a 10% interest in the Yonge & Gamble property as a member of HTBH.

The AMF disputes Defendants' claim that Dr. Hashim had no interest in HT.  The AMF claims that at all times he owned a 40% share along with Nezhet Tayeb and that he participated in the purchase of Yonge & Gamble.  Further, the AMF says JHH's 1988 accounting records indicate that JHH also had a 2/3 ownership interest in HT's 10% interest in the Yonge & Gamble property, valued at C$348,000, which also equals 2/3 of the $522,000 contributed by TWH for the purchase of the Yonge & Gamble property.  According to the AMF, JHH's accounting records later reduced this ownership interest to 1/3 of 10% and, even later, the entire ownership interest and debt was removed from JHH's books entirely.  However, when the property was sold, JHH presumably earned a profit of C$240,219, and the AMF contends this amount was reflected in JHH's 1990 accounting records, although JHH never actually received any of the monies.  Instead, that amount was offset against the shareholder advances, which in effect allowed Jafar to settle a debt that was due JHH from Landglaze.

**E.      HTBH Developments, Inc. and Its Purchase of Yonge & Gamble**

According to Defendants, HTBH Developments, Inc. ("HTBH") was a joint venture formed in late 1988 to purchase the property Yonge & Gamble.  Everyone agrees that HTBH consisted of the following shareholders:

| | |
|---|---|
| Manalco Properties Ltd. | 26% |
| First Tee Investments Corp. | 27% |
| Bashco Holdings, Inc. | 27% |
| Gharco Holdings, Inc. | 10% |
| HT Canadian Capital Corp. | 10% |

HTBH purchased Yonge & Gamble for approximately C$18,250,000 and each shareholder held an ownership interest in an amount equal to its respective number of shares.

According to Defendants, each member of HTBH held their interest in trust for others.  In particular, Defendants contend that HT held its 10% interest in trust for Landglaze.  Defendants say this was done for tax purposes.  Landglaze's  investment through HT in Yonge & Gamble totaled $522,000, which Defendants say Landglaze wired to Mr. Hussain on behalf of HTBH through an entity called TWH Management, Ltd., a company in turn owned by Nezhet Tayeb.  Jafar further

affirmatively denies that his father, Dr. Hashim, had any interest in HTBH or the Yonge & Gamble property and that Jafar's and JHH's only interest in the Yonge & Gamble was by way of Jafar's ownership interest in HT.

The AMF disagrees, claiming Dr. Hashim had an interest in HTBH at the time the Yonge & Gamble property was acquired. The AMF has alleged throughout these proceedings that Dr. Hashim was actively involved in HTBH and that his attempts to resign or be removed retroactively to before the purchase of the Yonge & Gamble property were ineffective. The AMF further alleges that the Yonge & Gamble property acquired by HTBH was subsequently transferred to JHH, who carried it on its books in the original investment amount of $348,000.

No one disputes that the property was sold to Cambria Enterprises Ltd. in March of 1989 for $27 million, $5 million of which represented a seller carry-back mortgage to HTBH. HT received a check for $745,029.39,[8] which Jafar, on behalf of HT, endorsed over to Mr. Shami on behalf of Landglaze and deposited into Landglaze's Ifabanque account. In 1990, the $5 million carry-back was paid in full and Alico Management, Ltd., a company owned by Atta Hussain, issued a check to HT for C$505,682, which Jafar again endorsed to Mr. Shami on behalf of Landglaze and deposited into Landglaze's account with Ifabanque. The AMF also says HT received several interest payments totaling C$44,000, which were deposited into HT's Toronto Dominion Bank account and subsequently paid out to an unidentified payee.

**F.    Nova Scotia 920 and Nova Scotia 933**

Nova Scotia 920 was formed in May, 1989 and Nova Scotia 933 in June, 1989. The AMF contends that 920 and 933 were formed by Jafar to operate as conduits and hiding places for monies and properties controlled by Dr. Hashim and/or Jafar. It points out that these two entities were formed suspiciously soon after the AMF joined Jafar in the English proceedings.

Defendants, of course, disagree with the AMF's characterization. Jafar agrees he effectuated the formation of 920 and 933, but says he did so only at the request of Landglaze and Nuha Moubark. He also denies anything suspicious about the timing of the formation of NS 920 and NS

---

[8]The AMF's expert, Stephen Clarke, indicates in his report that HT received $749,029.

1  933. He represents that the reason for the formation of the NS 920 was twofold: He wanted to wind

2  up his real estate business and Landglaze wanted to terminate Jafar's and JHH's involvement in its

3  property investments and management to avoid any involvement in the lawsuits against Jafar.

4  Landglaze wanted to transfer the properties JHH held in trust for it to a new entity, NS 920. With

5  respect to NS 933, it was formed in order facilitate his aunt Nuha Moubark's immigration into

6  Canada, which he believed would be easier if she owned some Canadian properties.

7  The AMF further contends that the tax reports for NS 920 indicate Ahmed Tayeb, son of

8  Nezhet Tayeb, as the sole shareholder and Maryam Salass as its sole officer. The tax reports for NS

9  933 list Nuha Moubark as the sole shareholder and Maryam Salass as its sole officer. Jafar denies

10  these representations, stating that he does not know on which tax returns the AMF is relying.

11  Chambly 2 and Duke & William were transferred to NS 920 in July, 1989. According to the

12  AMF the transfer was for no consideration, other than also transferring the C$1.5 million debt owed

13  to Landglaze. Six years later, Duke & William was sold Sciroco Holding, Inc. for $360,000.

14  According to the AMF, the proof that NS 920 (and, for that matter, Landglaze) acted as a conduit

15  for monies and properties controlled by Dr. Hashim and/or Jafar includes the improbable fact that

16  Landglaze would allow NS 920, a start-up company with no financial history, to assume

17  responsibility for JHH's C$1.5 million debt to Landglaze.

18  The parties agree that JHH sold Chambly in July, 1989, to NS 933 for C$322,000 and St. Luc

19  in January, 1990, to NS 933, for C$260,000. The money for these two payments, according to the

20  AMF, came from a December, 1989 transfer, credited as a shareholder advance, from Landglaze to

21  NS 933 of C$750,000. Jafar says he only assisted Nuha Moubark in the formation of NS 933 to hold

22  these two properties. NS 933 is now defunct and default judgment was entered against it by this

23  Court. The AMF has recovered its interest in these properties. The funds from these sales were

24  deposited by JHH into its bank account with the Bank of Tokyo on July 13, 1989 and January 24,

25  1990 respectively.

26  **G.  Landglaze Holdings SA**

27  Landglaze is at the heart of the tangled web that is this case. Nezhet Tayeb and Edward

28  Shami were in charge of many of its financial transactions. While Defendants deny that Dr. Hashim

1  had any ownership interest in Landglaze and was never an officer, director or shareholder in

2  Landglaze, the AMF points out the Tayeb was closely associated with Dr. Hashim and that

3  Defendants admitted in the English Proceedings that proceeds from the sale of the Don Mills

4  property, approximately C$1,750,109, were transferred from an account in the name of the Rosehill

5  Trust to Nezhet Tayeb as repayment for Tayeb's loan originally advanced to the Rosehill Trust for

6  the purchase of the Don Mills property. The AMF's expert, Stephen K. Clarke, suggests that

7  C$1,750,019, if invested in a 2-year Canadian bond, would have matured to approximately

8  C$2,073,968 in October, 1988 – an amount quite close to the combined amount of C$2,022,000 in

9  loans made by Landglaze and TWH to JHH in October-November, 1988.

10      Jafar says he had essentially two separate business relationships with Landglaze – one

11  through his company JHH and one through his company HT. With respect to JHH, Landglaze

12  advanced the C$1.5 million to JHH to fund the purchase of Chambly 2 and Duke & William, for a

13  total of C$985,462.75, which JHH held in trust for Landglaze. According to Defendants, it returned

14  the remaining funds in two transactions, both dated May 19, 1989, in the amounts of $300,000 and

15  $148,000. The $300,000 payment was by certified check made payable to JHH, but endorsed to

16  Landglaze and ultimately deposited into Landglaze's Ifabanque account on May 31, 1989. The

17  $148,000 was returned by way of a certified check payable to JHH and endorsed and deposited into

18  JHH's Toronto Dominion bank account, and eventually transferred to NS 920's Toronto Dominion

19  account on July 14, 1989.

20      With respect to HT, Jafar testified that he is the sole owner of HT, essentially a holding

21  company, which holds in trust for Landglaze 10% of the shares in HTBH, another holding company

22  in turn. HTBH purchased the property Yonge & Gamble, in which Landglaze invested C$522,000.

23  Defendants say Landglaze invested the $522,000 in Yonge & Gamble by wiring such funds to Atta

24  Hussain, on behalf of HTBH, through a company called TWH Management Limited.

25      **H.    Ali Salass**

26      Ali Salass is implicated by the AMF in the conspiracy in one transaction. This was the

27  transfer in February of 1994 of $80,000 from NS 933's Toronto Dominion Bank account into Ali's

28  Bank One account in Phoenix. At the time, Maryam was the sole officer of NS 933 and she

1 authorized the transfer. She testified that this was at the direction of her husband, Jafar. The money
2 was then used as a down payment on a condo in Phoenix known as 4724. The AMF contends that
3 the money, flowing from NS 933, was traceable to the AMF and the transfers were intended to
4 launder and conceal it from the AMF. Defendants contend that the money was transferred by Sadik
5 Hashim on behalf of his wife, Nuha Moubark, and was repaid by Ali, after 4724 was sold, through
6 two cashier's checks payable to Sadik but given to Jafar for delivery.

7 **III.    DISCUSSION AND ANALYSIS**

8   **A.    The Big Picture**

9   To begin, it is important to remember the context of this case. Originally the AMF pled eight
10 counts in this adversary. The middle four counts – III through VI – were dismissed in March, 1997,
11 by written memorandum decision on the ground that the AMF did not have standing to pursue
12 fraudulent conveyance claims that belonged to the estate. *See* docket 99. What remained then were
13 two sets of claims: Counts I and II stating a traditional fraudulent misrepresentation claim requiring
14 proof of the nine elements of fraud and Counts VII and VIII alleging a "civil conspiracy to commit
15 fraudulent transfers" of properties by fraudulently concealing and misrepresenting the existence and
16 location of the Canadian properties held by JHH, the two numbered Nova Scotia corporations and
17 2626 Quebec.

18   As to the fraudulent misrepresentation counts, the elements of proof require a showing by
19 clear and convincing evidence that the Defendants made knowing and material misrepresentations
20 of fact upon which the AMF rightfully and reasonably relied to its damage. There are plenty of
21 knowing misrepresentations of fact in this case; Jafar admits as much and the Court has previously
22 found as much. The devil is in the other elements, particularly given that the AMF called no
23 witnesses of its own.

24   With respect to the civil conspiracy claim, there is no general tort of civil conspiracy in
25 Arizona, the source of law relied upon by both parties. There is, however, a tort of conspiracy to
26 commit a fraudulent conveyance. Arizona law recognizes an action for damages caused by acts
27 pursuant to a conspiracy but not for the conspiracy alone in the absence of acts taken pursuant to the
28 conspiracy with resulting damage. This occurs when there is (a) a fraudulent conveyance (made

with intent to hinder, delay or defraud creditors); (b) an agreement between two or more persons to commit a fraudulent conveyance damages; (c) damages resulting from the conveyance that are traceable to the conspiracy; and (d) inadequate equitable remedies available under the Uniform Fraudulent Conveyance Act. *Pearce v. Stone*, 149 Ariz. 567, 720 P.2d 542 (App. 1986); *McElhanon v. Hing*, 151 Ariz. 386, 728 P.2d 256 (App. 1985). In *McElhanon*, the Court stated:

> However, the action for damages arising from conspiracy to commit a fraudulent conveyance is a remedy that should be used only where the remedies under the UFCA are inadequate. Such a situation may occur where the fraudulent transferee has subsequently transferred the property to a bona fide purchaser for value [*e.g., Transamerica v. Trout,* 145 Ariz. 355, 701 P.2d 851 (App.1985)] or where the fraudulent transferee has allowed, or, as in this case, caused the fraudulently transferred property to substantially decrease in value.
>
> We hold that the common law action for damages against a conspirator in a fraudulent conveyance is the value of the property fraudulently transferred or the amount of the debt, whichever is less. Our formulation of damages is similar to the result reached by courts exercising their powers in equity to award money damages against a fraudulent transferee.

*Id.* at 263-64, 728 P.2d at 393-94.

Therefore, the issue presented is whether the facts in this case fit within this cause of action? The Court has already dismissed (several years ago) claims based directly upon the Trustee's rights under 11 U.S.C. sections 544(b) and 548. The Trustee, however, did not pursue those claims and they were lost. Can it be said that the equitable remedies are inadequate where they were simply not pursued by the party with standing to do so? And, secondly, to the extent that the Defendants here are parties who could have been Defendants in a fraudulent conveyance case brought by the Trustee (*i.e.*, as immediate or mediate transferees), is it proper to include them in a conspiracy claim? Both the *Pearce* and the *McElhanon* cases involved the question of whether parties outside the chain of transfers – in both cases attorneys who facilitated the transfers – could be liable for the conspiracy claim. Nothing in the cases suggests that the conspiracy theory can be used as a substitute for the fraudulent conveyance theory itself.

Although there is a whiff of fraudulent conveyance theory in this case (*i.e.*, the transfers were made with the actual intent to hinder delay or defraud creditors), the real gravamen of the claim is that the Defendants conspired to defraud the AMF specifically by engaging in a conspiracy to

Case 2:96-ap-00668-CGC    Doc 405    Filed 01/03/07    Entered 01/03/07 16:34:34    Desc
Main Document    Page 15 of 33

conceal assets acquired with AMF money. Would such a claim be recognized by the Arizona Courts? Although not crystal clear, the answer appears to be yes; in other words, nothing in the two court of appeals decisions suggests that damages arising out of a conspiracy are limited only to circumstances involving classic fraudulent conveyances. Rather, the cases are framed that way because that is what the facts supported. Here is how the *McElhanon* court stated the general rule:

> The gravamen of a civil action for damages resulting from an alleged conspiracy is thus not the conspiracy itself but rather the civil wrong which has been committed pursuant to the conspiracy and which results in damage to the plaintiff. The resultant damages in a civil conspiracy action must necessarily result from overt acts, whether or not those overt acts in themselves are unlawful.

*Id.* at 262, 728 P.2d at 392.

The question presents itself whether the AMF must prove in this cause of action that the source of funds in the various transactions was AMF money. The answer is yes because that is the specific harm alleged to have been suffered by the AMF. And, certainly, that is how the AMF has presented the claim (*see, e.g.*, AMF Opening Brief, lines 13 to 24, page 92). To the extent the harm is general, then the claim must fail for the same reasons as the prior four counts were dismissed.

Therefore, for both of the claims, proof that the funds used to purchase the properties derived from the AMF is an essential cog in the wheel.

## B.     The Fraudulent Misrepresentation Claim

For the AMF to succeed in this claim, it must prove the following:

(a)     A representation;

(b).     Its falsity;

(c)     Its materiality;

(d)     The defendant's knowledge of its falsity or ignorance of its truth;

(e)     The defendant's intent that it should be acted upon by the plaintiff and in the manner reasonably contemplated;

(f)     The plaintiff's ignorance of its falsity;

(g)     The plaintiff's reliance on its truth;

(h)     The plaintiff's right to rely thereon; and

(i)     The plaintiff's consequent and proximate injury.

- 16 -

*Carrel v Lux*, 101 Ariz 430, 434, 420 P.2d 564, 568 (1966).

Thus, the claim asserted by the AMF is not a mere tracing claim, *i.e.*, a case made by showing the source and destination of funds, although such proof is part of the claim. Rather, it is a classic fraud claim where all nine elements must be proven.[9]

The representations at issue are primarily those by Jafar explaining the business of JHH, HT and the Nova Scotia entities. As fulsomely explored by the AMF in its 96 page brief, Jafar has given many different explanations over the years of how and why JHH was formed, what its purpose was, whose money it invested, and the like, and, for a significant period of time, denied, failed to mention and/or inadequately explained the existence of NS 920 and 933. The great bulk of the AMF's opening brief is devoted to a detailed deconstruction of every bit of testimony and explanation offered by Jafar on these subjects. However, little discussion is offered on what the AMF apparently concluded must be accepted by the Court as the obvious – that it was entitled to rely on these false misrepresentations and that it in fact reasonably did so. Further, there is little discussion or proof of the damage suffered. Again, perhaps the AMF assumes that is obvious; to the Court, however, it is not.

For example, assuming all other eight elements have been proven, what is the dollar amount of the loss suffered? Is it the amount of traced money claimed to have gone into the various properties or is it the properties themselves, and, if so, at what value? What is the impact of the default judgments against the NS companies and the subsequent recovery of their remaining assets? How much was recovered and what is the appropriate credit to be given? A hundred percent; something less? Are all Defendants equally liable?

In addition, the AMF requests its attorneys fees and costs, but cites no legal authority other than the legal aphorism that "delay is the essence of prejudice." All the parties to this litigation know that legal fees are awardable in bankruptcy proceedings only pursuant to specific statutory or other legal authority. Are fees recoverable as part of the damage suffered by the misrepresentations

---

[9]The Defendants' *res judicata* defense suggests that the reason why the AMF has framed its claim in this manner is because the AMF already tried and lost the tracing claim in the English Proceedings.

1   because they were incurred necessarily in the uncovering of the fraud? The Court assumes that is

2   the theory, although it is not clearly spelled out.

3       The AMF has tried and lost two other similar tracing cases during the course of these

4   bankruptcies. The reason was the same in each: failure to establish the AMF as the source of the

5   funds either used to purchase assets or shuttled around multiple overseas accounts. That problem

6   remains in this case. To address it, the AMF hired Stephen Clarke to render an expert opinion on

7   the source of funds used to purchase the various properties in question. Thus, a close review of the

8   Clarke report and testimony will be necessary to determine if this time the AMF has overcome the

9   step that has foiled it in the past.

10      **C.      The State of the Record**

11      The record here is overwhelmingly voluminous, with the testimony reaching over 1000 pages

12  and the exhibits filling 16 banker's boxes. Yet it remains frustratingly incomplete and convoluted,

13  on both sides of the table. First, on the AMF's fraudulent misrepresentation claim, there is not a

14  shred of evidence from an AMF witness on several of the key elements of the cause of action. Did

15  the AMF actually rely on information provided by a person it claims to be an unrepentant liar? If

16  so, how? If the AMF did rely, was such reliance reasonable? Why was it reasonable? How was

17  the AMF damaged?

18      There is also no evidence (by deposition or otherwise) from any witness who is the actual

19  principal of any of the various entities or an alleged conduit of the funds, other than Atta Hussain.

20  Nothing from Edward Shami; nothing from Nezhet Tayeb; nothing from Nuha Mubark; nothing

21  from Sadik Hashim.

22      And there is nothing in either the complaint, the joint pretrial statement *or* the closing brief

23  setting forth with any particularity the damages allegedly suffered by the AMF. The same is true

24  of the evidence offered at trial. The AMF's expert, Mr. Clarke, did not offer an opinion on damages

25  and no AMF witness testified to the scope of damages.[10] This is particularly important because at

26

27      [10]Curiously, Clarke was asked on direct examination about the elements of damage for a victim
    of fraud and was further asked if he had ever been asked to prepare an opinion on such damages. Tr.
28  Dec. 2, 2004, at 8. But he was *not* asked to prepare such an opinion in this case.

least two of the properties, Chambly I and St. Luc, have been actually recovered by the AMF through execution on default judgments obtained *in this case* against 933.

It is no better on the Defendants' side of the case. Again, there is no testimony from Shami, Tayeb, Hussain, or Mubark through deposition or otherwise. Video presentation of evidence was obviously available, as was shown in the case of Dr. Hashim. Instead, however, Defendants rely almost entirely on the testimony of Jafar, a debtor whose discharge has already been denied (on summary judgment, yet) for wilful untruthfulness, and Dr. Hashim, a debtor who has been convicted of perjury and who voluntarily waived his discharge. Although there is voluminous evidence documenting the most minute details of many transactions, there are also huge gaps.

Given this state of affairs, it is best to return to basics. What are the elements of each cause of action? Who has the burden of proof? What is the standard of proof? And, has the burden been met to the degree of the applicable standard?

### D.  The Burden of Proof

#### 1.  Counts I and II–the Fraudulent Misrepresentation Claims

In its Opening Brief, the AMF concedes that it must prove the nine elements of its fraudulent misrepresentation claim by clear and convincing evidence. (Opening Brief, p. 90). However, in its reply, it asserts that it "is not required to prove that the proceeds from sale of Don Mills are the same monies transferred to JHH in 1988 by clear and convincing evidence. Rather, AMF will meet its evidentiary burden by showing by a preponderance of the evidence that the Don Mills property proceeds were transferred to JHH in 1988," citing several cases (Reply brief, p. 10). Because proving that the money could be traced from the AMF is an essential element of its proof of damage, as well as the materiality of the representations made and the AMF's right to rely upon them, what legerdemain removes this element from the higher standard of proof?

The cases cited by AMF are instructive but not helpful to its cause. The first, *Elmer Company v. Kemp*, 67 F.2d 948, 952 (9th Cir. 1933), is a diversity case applying California law to a constructive trust tracing case arising out of an embezzlement. The burden of proof was not at issue, as the Court of Appeals reversed in any event for insufficient evidence, although the

Court did recite the statement from the District Court that preponderance of the evidence was the standard. At best, any mention of the burden by the Circuit is dicta. However, the key points are two. First, this was a tracing case seeking imposition of a constructive trust. That is not the claim alleged here, as noted in detail above. This is a fraud case and the fraud standard applies. Second, that was a diversity case applying California law; here, all parties concede that Arizona law requires clear and convincing evidence. The second case, *Central National Bank of Cleveland, Ohio v. King et al.*, 573 F.2d 669 (10th Cir. 1978), is again a diversity case applying Colorado law that states clearly, "fraud must be established by clear and convincing evidence." *Id.* at 673. The third, *In re Hellesen*, 1999 WL 33457793 (Bkrtcy. D.N.H. Jan. 11, 1999), again applied state constructive trust, not fraud, law. The court noted that New Hampshire and Massachusetts were the competing jurisdictions for purposes of choice of law, noted further (in passing) that New Hampshire required clear and convincing evidence while Massachusetts allowed a preponderance, then chose Massachusetts law and found that the plaintiff in any event had failed to carry its burden. The fourth case, *In re Stiennon*, 73 B.R. 905 (Bankr. W.D. Wis. 1987), was another state law constructive trust case stating that the proof "must be at least a preponderance of the evidence although many cases and commentators suggests the evidence must be 'clear and convincing'," *id.* at 907, before holding that the plaintiff failed to carry its burden in any event. Finally, *MacKenzie v. Fritzinger*, 370 Mich. 284, 291 (Mich. 1963), is another state law constructive trust case that states, without discussion or controversy, that a preponderance is the correct standard for that type of claim.

In short, the AMF's proposition that it can prove critical elements of its fraud case merely by a preponderance of the evidence is wholly unsupported as a matter of law. The evidence must be viewed through the more stringent prism of whether it is clear and convincing.

2.      **The Conspiracy to Commit Fraudulent Conveyances Claims: Counts VII and VIII**

Neither party directly addresses in its brief what the standard of proof is for the conspiracy claim. However, the sparse Arizona case law recognizing this tort makes it clear that the same

"clear and convincing" hurdle must be met for these claims.

In *McElhanon*, the appellant argued that the jury had been improperly instructed on the burden of proof. There, the jury had found that a lawyer had conspired with his client to commit a fraudulent conveyance. The lawyer was out of the chain of title and hence could not be reached as a transferee. The Court stated the following:

> While it is recognized that a conspiracy may be, and usually must be, proved by acts and circumstances sufficient to warrant an inference that the defendants have reached an agreement to act together for the purpose alleged, the test of the sufficiency of the evidence is that the facts and circumstances relied upon to establish the conspiracy must be inconsistent with a lawful or honest purpose and reasonably consistent only with the existence of the conspiracy. 265, 395

In support of its "must be inconsistent with" test, the Court relied upon a case from the Illinois Supreme Court holding that the evidence supporting the conspiracy claim must be "clear and convincing." *Tribune Co. v. Thompson*, 174 N.E. 561 (Ill. 1930). The other Arizona case cited for the existence of a claim for conspiracy to commit fraudulent conveyances, *Pearce, supra*, does not discuss the standard of proof.

### 3. The Defendants' Affirmative Defenses

The Defendants have asserted two primary affirmative defenses. First, they contend that the fraud and conspiracy claims are barred by the statute of limitations. Second, they claim that all claims relating to the disposition of the proceeds of Suite 803 are barred by *res judicata* by virtue of the English Proceedings. On each of these defenses, the defendants have the burden of proof. There is apparently no dispute that the usual civil standard of preponderance of the evidence should control any factual findings underpinning those defenses.

### E. The Fraudulent Misrepresentation Claims

### 1. The Don Mills Proceeds

(a) The AMF's Burden

To recap, for the AMF to prevail on Counts I and II, it must prove the nine elements of fraud set forth above by clear and convincing evidence.

(b)     Jafar's Testimony

First a word about the Jafar Hashim testimony.  Jafar's testimony in these bankruptcy proceedings has, from the beginning, been incomplete, misleading, vague, contradictory and outright false.  Many reasons have been given; he was unfamiliar with the court proceedings, he didn't trust the AMF after the English Proceedings, he didn't understand the questions, or perhaps he just lied.  Whatever.  Who knows; maybe this time he is telling the truth.  But the fact is that it is too late to rehabilitate this witness and therefore it is impossible to know. The problem with a liar in court is that when he decides to tell the truth, no one believes him.  That is the case here. At this point in the proceedings, therefore, the Court will give little, if any, credence to any of Jafar's testimony.  This statement is qualified only to the extent that there may be aspects of his testimony sufficiently corroborated by other evidence to make it useful.

Under these circumstances, the Court has no difficulty finding by clear and convincing evidence that Jafar made representations to the AMF concerning the properties at issue that were false, that he knew were false, and upon which he intended the AMF to rely. What of the other elements of the tort?

(c)     The Clarke Opinion

1.     What is Needed

A critical element is that the AMF show that it was damaged as a result of the misrepresentations.  That is the first place its proof breaks down.  It is a given, in light of the findings of Justice Chadwick, that the money used to purchase Don Mills derived from the AMF; no additional proof is required on that score.  The key issue for the AMF's claims to Chambly 2 and  Duke & William is whether Don Mills funds flowed through Landglaze to JHH for the purchase of those properties, and for Yonge & Gamble, whether Don Mills proceeds flowed from Landglaze to HTBH for the purchase of HT's 10% share in that property. The evidence on both scores does not rise to the level of clear and convincing.

The AMF relies entirely upon the testimony of Clarke on these points.  Clarke prepared a report and made an analysis after reviewing selected documents provided to him by the AMF. As noted by the Defendants, he did not review the depositions of Dr. Hashim, Jafar, Maryam, Ali, Harvey Kagan, Barry Papazian or any other individuals actually participating in the transactions.  As noted, he may have concluded, after such review, that the explanations given were contrary to the written record, but the fact is, he didn't do it.

Clarke's report and testimony are premised on several conclusions.  First, the Don Mills proceeds were transferred to Nezhet Tayeb.  Although he admitted the documents he reviewed did not establish that fact, it had been previously found by Justice Chadwick and thus will be taken as established for the purposes of this case. Second, Tayeb transferred the Don Mills proceeds to Landglaze and Landglaze transferred them to JHH for the purchase of Chambly 2 and Duke & William and to HTBH for the purchase of HT's interest in Yonge & Gamble.  To arrive at these conclusions, Clarke opined, among other things, that Landglaze was an instrumentality of the Hashim family used to "launder" AMF money through the purchase of real estate investments.

However, although he gave his expert opinion that the Don Mills money flowed from Tayeb through Landglaze on its way to JHH, he admitted that he did not *know* that it had.  As he put it, "I don't know where Landglaze got its money from.  I don't even know that it came from Nezhet Tayeb for that matter." December 2, p. 22, ll. 14-15.  Thus, his expert opinion was a conclusion drawn from inferences rather than from hard proof. It should be noted that this type of opinion is subtly different from expert opinions usually seen in bankruptcy cases.  Typically, an expert opines on a matter that itself is hypothetical.  For example, a valuation expert will opine on the value of a property based upon a review of available information on the market and comparable sales.  But his is not an opinion of fact; it is merely that expert's conclusion of what a property would sell for in a *hypothetical* sale.  Here, Clarke is giving an opinion on a matter of fact: it is either true or not true that, in the past, Tayeb and/or the Hashims used Landglaze as a vehicle to transfer the Don Mills proceeds to JHH.  Thus, it is not sufficient, as it is at times with

valuation evidence, for the expert to establish a range within which his opinion will fall. Rather, in the context of this case, the proof must be clear and convincing that AMF money actually was the source of the Landglaze advance to JHH. Clearly, as a matter of evidence, an expert may rely upon non-conclusive evidence to arrive at his opinion if such material is of the type normally relied upon by experts in the field. There is no suggestion here that the forensic evidence reviewed by Clarke was outside that realm; the question is, however, does an opinion so constructed support a finding of clear and convincing evidence?[11]

2. What Clarke's Report Says

Much of the Clarke report is non-controversial. The first several pages (4 through 17) simply quote from the English Judgment of Justice Chadwick and the next portion (18 through 30) sets forth the details of the ownership of the various properties. The next section (31 through 50) describes the various entities involved and contains a number of conclusions contested by the Defendants as to control and purpose of the entities. The critical portion finally arrives at pages 51 through 56 where Clarke discusses Landglaze Holdings. As noted already, it is the AMF's burden to prove by clear and convincing evidence that the money Tayeb received from the Don Mills sale was transferred to Landglaze and funded the transfer of C$1,500,000 to JHH. What, then, is the basis of Clarke's opinion on this crucial point?

It is limited and entirely circumstantial. Clarke notes the relationships among the principals of Landglaze and the Hashims which are not contested by the Defendants and describes the various transfers which again are not contested. On page 54, he arrives at the issue of "liabilities," in which he discusses the evidence of the source of the Landglaze funds. He states:

The sources used to fund the late 1988 payments of C$1,500,000 and C$522,000

_____

[11]As will be discussed later, the AMF's proof is not only the Clarke report. It urges that many other "facts," or what the AMF calls in its reply the Defendants' "failure to offer an explanation for" various facts or circumstances, bolster the Clarke report to reach the clear and convincing hurdle. It also argues that requiring a definitive opinion is unreasonable given the Defendants' concealment and destruction of relevant information.

allegedly made by Landglaze Holdings are unclear based on the information Landglaze has reviewed. The two payments required total funds of C$2,022,000.

One potential source of the C$2,022,00 is the C$1,750,110 payment to Nezhet Tayeb on October 27, 1986 from the proceeds of the Don Mills Bowl Shopping Centre sale. Mr. Tayeb may have simply turned this receipt around and used it to fund the 1988 payments through Landglaze Holdings. Justice Chadwick found Dr. Hashim purchased the Don Mills Bowl Shopping Centre using AMF funds.

*               *               *

If the C$1,750,110 had been invested in a 2-year Government of Canada bond on October 31, 1986, it would have earned an annual rate of 8.86% and matured with a value of C$,073,968 on October 31, 1988 (i.e., sufficient to fund the two payments totaling C$2,022,000).

*Conclusion*

Landglaze Holdings operated as a conduit for monies and properties controlled by Dr. Hashim and/or Jafar Hashim.

Clarke then supports these conclusions by noting (1) that Landglaze is a Panamanian corporation, thereby allowing "for a degree of anonymity that would be attractive to anyone who was seeking to conceal assets from a US Bankruptcy Court;" (2) Tayeb had authority to effect transactions on behalf of Landglaze and Justice Chadwick had previously found him to be "simply not credible;" (3) the documentation of the Landglaze transfer to JHH is scanty at best; (4) JHH paid Landglaze money at a time it was not due and "for which there was no commercial reason;" (5) Jafar received C$265,000 from Landglaze that was made in a "convoluted manner" and for which there was no commercial reason; (6) the balance on the Landglaze account was ultimately transferred to Sadik; and (7) an advance by Landglaze to 933 was treated by 933 as a shareholder advance and no evidence was found that Landglaze ever was a shareholder of 933.

These conclusions, among other things, were more fulsomely developed during his testimony. Clarke acknowledged that he had no evidence of what account of Landglaze had been used to fund the JHH transfers or indeed what accounts Landglaze may have had; indeed, he agreed that there was no evidence that he reviewed that demonstrated that Landglaze had

- 25 -

even made the transfers, stating instead that such a conclusion "wouldn't amount to anything more than a reasonable inference." Further, he had no evidence that AMF money paid to Tayeb from the Don Mills sale was the source of the transfer to JHH; however, he believed that it was a "reasonable inference" to draw. He further acknowledged that he did not know whether Nezyet Tayeb was a shareholder of Landglaze[12] and agreed that he was neither an officer nor a director of Landglaze. The two connections he advanced were, first, that Tayeb's wife shared a last name with the two officers of Landglaze and, second, that Tayeb had been involved in the Ifabanque account in Paris which, significantly, was not opened until substantially after the JHH transfer. Further, he did not know what other sources of money Tayeb may have had to fund Landglaze or whether Landglaze was funded from completely non-Tayeb sources.

Therefore, the critical question is whether the circumstantial evidence relied upon by Clarke is sufficient to support his conclusion. His speculation about the anonymity of bearer shares is interesting but not particularly enlightening in this context, as is the speculation about the similarity of Tayeb's wife's last name to those of the officers and directors of Landglaze. The record is silent on whether these are common names there is no corroborating evidence on their significance. It is true that the documentation for the transfer is scanty and that there has been no documentary evidence put forth for the defense to explain the source of the money transferred by Landglaze; this certainly suggests that such evidence, if introduced, would not be helpful to the defense because certainly if Landglaze bank records would have sealed the deal for the Defendants, one would expect that they would have been obtained and submitted. The payment of "advance interest" is problematic, although not particularly persuasive. This is one of the circumstances where Jafar's testimony would be helpful, but where his lack of credibility negates its usefulness. He testified that he returned the excess of the funds transferred because they had not been invested. Even without Jafar's testimony, this explanation suggests itself from the record and Clarke acknowledged that reduction of principal could have a viable commercial purpose. The transfer to Sadik, likewise, is interesting but not terribly probative. As suggested

---

[12]This is not surprising in light of the fact that Landglaze had issued bearer shares.

Case 2:96-ap-00668-CGC   Doc 405   Filed 01/03/07   Entered 01/03/07 16:34:34   Desc
Main Document   Page 26 of 33

in the cross-examination, Sadik could be a shareholder of Landglaze, although there was certainly no evidence presented to that effect, or he could have been owed money by the shareholders, whoever they may have been. It could be, of course, that the transfer to Sadik was another step in "laundering" AMF money that had passed from Dr. Hashim to Tayeb to Landglaze, but there is no real evidence to support that supposition. The other arguments supporting the conclusion likewise lack serious probative value.

If the Clarke report and testimony, therefore, were the only basis for AMF's argument that the Landglaze transfer was funded with AMF money, it would clearly, in the Court's view, not satisfy a clear and convincing burden of proof. Indeed, Clarke's analysis of the key issue of the source of the Landglaze money is a minor part of his report and his testimony. This is not totally surprising, however, in that he saw the scope of his employment as identifying "if there were assets that were inexplicably or inappropriately transferred out of the Estate that might be brought into the Estate for the benefit of the Creditor's (sic) in this case." As noted earlier, the AMF's efforts to prosecute claims held by the estate was previously rejected and those claims dismissed. Therefore, a good deal of Clarke's report is not related to the points needed to be proven here.

However, the AMF argues further that the Clarke evidence must be viewed in the context of the case. Specifically, the record supports the conclusion that the Defendants, in particular Jafar, has failed to disclose key information numerous times and has routinely destroyed financial documents. Further, the AMF argues that the lack of corroborating evidence from Landglaze, Tayeb, Shami and others is telling in the extreme.

The Court is cognizant of these arguments and troubled by the long pattern of deceit demonstrated by Jafar's actions and his previous testimony. However, the law sets the bar at a heightened level in fraud cases for a reason and that is to ensure that a finder of fact is convinced that the plaintiff has carried its burden to a high degree given the nature of the cause of action alleged. That burden must be affirmatively carried by the plaintiff and, although circumstantial evidence is common in fraud cases, in this case the strength of such evidence is insufficient on

the critical issue of the source of funds.

To summarize, the plaintiff must prove all nine elements of fraud by clear and convincing evidence. Failure to prove one of them is fatal to the claim. Here, the AMF has failed to prove that it was damaged as a result of the misrepresentations made by Jafar because it cannot prove that its money was used to fund the transactions. Thus, judgment on all fraud claims relating to the Don Mills proceeds (Chambly 2, Duke & William, and Yonge & Gamble) will be given to the defendants.

### (d)    Charlemagne

Charlemagne is different. This property was not alleged to have been purchased with Don Mills proceeds. Indeed, Clarke made it clear that he did not know the source of the funds used to purchase this property. Defendants set out their case on this point in their responsive brief and it is convincing. Whatever purpose Charlemagne may have served, the AMF has not proven that its acquisition was the result of misappropriation of AMF funds. Therefore, judgment on Charlemagne will be given to Defendants.

### (e)    The Suite 803 Proceeds

In 1994, Justice Chadwick found that Suite 803 had been purchased by Salwa using AMF funds, required Jafar to account for the proceeds from the Suite 803 sale and restrained him from disposing of the proceeds until other aspects of the judgment against him were satisfied. Prior to that time, however, C$511,451 of those proceeds had been transferred by Salwa through an account jointly owned by her and Jafar to JHH where they were used to purchase St. Luc and Chambly 1. As noted above, St. Luc was sold to 933 in 1990 for C$260,000 and those proceeds were paid to JHH and thereafter, according to Jafar, used for living expenses and legal fees. Chambly 1 was sold to 933 in July, 1989 for C$322,000 and, again according to Jafar, were used for the same purposes. In short, the amount of C$511,451 originally received by JHH was

replaced by C$562,000 within two years and thereafter spent.[13]  Meanwhile, the properties[14] were owned by 933 until the AMF acquired them through the execution in Canada of a default judgment obtained against 933 in this Court.  At the end of the day, the AMF acquired the two properties that had been purchased by the wrongfully misappropriated funds; it now seeks a judgment for damages against Defendants arising out of the same series of transactions.

The Defendants claim that the AMF's claims arising out of this series of transactions are barred by doctrines of issue and claim preclusion and by the applicable statute of limitations.  In short, Defendants argue (1) that the fraud and conspiracy claims could have been litigated in the English Proceedings because the AMF knew or should have known about them at the same time as it brought, and failed to win, its constructive trust claim against Jafar for Suite 802; (2) Justice Chadwick found affirmatively that Jafar did not know of Dr. Hashim's fraudulent scheme at that time and that finding is binding today; and (3), in any event, the applicable three year statute of limitations has long since run.  The AMF disputes the applicability of any of these defenses.

The AMF's damage claims are unspecified anywhere in the pleadings.  Faced with the fact that it has recovered the properties purchased with its money, it scrambles to find an explanation why that does not matter.  First, it argues that because Jafar has consistently maintained that he spent the C$511,451 on various expenses, he is judicially estopped from claiming that it remains tied up in the two properties.  But that makes little sense.  While it is undoubtedly true that Jafar's "tracing" was materially incomplete, as it left out the key point that the money that he spent upon disposition of the properties arose from a sale to a related entity, 933, what difference does it make?  The reality is that the AMF discovered that missing link and has now recovered the property through procedures in this Court and in Canada. Second, it argues that if any funds remain invested in the properties, it is the money 933 paid, not the

---

[13]There is no suggestion from the AMF that the "spending" part of Jafar's story isn't true; what was missing from previous "accountings" and "disclosures" were the transfers of the two properties to 933 of Maryam was sole officer and director and over which Jafar exercised control.

[14]The exception is a "sliver" of St. Luc purportedly bought back by JHH for C$45,000.  The state of the record does not allow a definitive finding on this issue.

original C$511,451. But, again, what difference does it make since this is a damage suit not a tracing claim–and, as noted, the AMF has the properties in any event.

The AMF presented no evidence that the combined value of the properties it recovered is less than any damages it suffered–and it was its burden to present that evidence at this trial. More tellingly, and inexplicably to the Court, the AMF **presented no evidence** on its fees and costs incurred as a result of the alleged fraud and conspiracy. There are no invoices from Snell & Wilmer, none from Canadian counsel and none from Clarke. There was no witness from the AMF describing the extent of the costs incurred and why they were necessary and reasonable. The record is simply and wholly silent on this critical issue.

This is not a case where attorneys fees and costs are awardable as an adjunct to a damage award, as, for example, under A.R.S. § 341.01. Under those circumstances, a party asks for fees if it prevails and the amount is determined in a post-trial proceeding. Here, the attorneys fees **are** the damages, or at least, a substantial portion of them. They have to be part of the case in chief, as there is no statute or rule known to the Court that otherwise would authorize their award. There is no order in place bifurcating trial on liability from trial on damages and the Joint Pretrial Statement likewise does not so provide. In short, having recovered the two properties originally purchased with its money and having presented no other evidence of damage, the AMF, on this record, is entitled to no further relief on the Suite 803 proceeds claims, even if it were to prevail on all other theories.

There are two other missing links in the AMF's fraud case on the Suite 803 proceeds–proof of actual reliance and the AMF's right to rely. The AMF scoffs that such evidence is necessary, arguing, in effect, that it, like any creditor, is entitled to rely upon Jafar's sworn statements and schedules and his many sworn statements in the English Proceedings and in this bankruptcy case.

This brings into focus the need to bifurcate Jafar's representations by time. First, there are the pre-bankruptcy representations, including the February, 1989 Affidavit in the Canadian proceedings. This Affidavit states that Jafar is the sole owner of JHH, that it was capitalized by

- 30 -

money given to him by his mother, that his father gave him no money to invest in JHH, and that it invested in real property for the benefit of others, including himself and his brother Omar. The AMF attacks the affidavit has materially misleading and, indeed, the affidavit makes no mention, for example, of the sale of the JHH properties to 933 and of 933's relationship to Jafar and Maryam. After this affidavit, the AMF amended its statement of claim in May, 1989 in the English Proceedings to include a claim, with regard to Suite 801, that Jafar had mortgaged the property "with actual or constructive knowledge of the dishonest and fraudulent breaches of trust" of Dr. Hashim.

This set of facts, among others, suggests that, as early as 1989, the AMF did not believe Jafar's explanation of JHH. That further suggests that it would be unlikely for the AMF to rely upon Jafar's future statements, or, at the least, to take them with a large dose of salt. The AMF responds that it is preposterous to suggest that a person can insulate himself from liability simply by lying ever more thoroughly, thereby making himself thoroughly unreliable. That may be a valid position, but the point for these proceedings is that AMF did not produce a witness to testify on this issue–in short, to make a record both as to its actual reliance and its right to rely. The Court declines simply to assume that elements of fraud exist where the standard is that they must be proven by clear and convincing evidence.

The lack of an AMF witness is nothing new. The injunction issued in Canada against the disposition of Suite 803 was dissolved largely because of the AMF's specific choice not to produce a witness to testify in those proceedings. Apparently, the same choice was made here and, as in Canada, there are consequences to that choice.

Given the failure of the AMF to prove the essential elements of its claim, it is not necessary to determine if any of the affirmative defenses asserted are valid and therefore the Court will not do so. However, suffice it to say it is not frivolous for the Defendants to suggest that at least some part of these claims may be barred either by claim or issue preclusion or by the statute of limitations.

**F.      The Conspiracy to Commit Fraudulent Conveyance Claims**

1..      The Landglaze claims

As noted above, sufficient proof that the AMF money funded the Landglaze transfers to JHH is an essential element of this claim as well as the fraud claim.  Therefore, for the same reasons, judgment will be given to the Defendants.

2.      The Suite 803 claims

For the reasons stated above, the Suite 803 conspiracy claims also fail because lack of proof on damages.  Therefore, judgment will be given to the Defendants.

3.      Ali Salass

The real gravamen of the conspiracy claim is an attempt to reach Ali Salass as to certain specific transfers.  Both parties agree that an alleged co-conspirator may only be liable for acts that occurred after joining the conspiracy.  In this case, that puts the focus on the transfer of $80,000 from 933 to Ali and the transfer of $150,000 to Westfalen Bank facilitated by Ali.  The AMF asserts that both of these transfers derive from Landglaze funds; however, the Court has already found that the AMF did not carry its burden with respect to proving that Landglaze's funding came from the AMF.  And, there is no suggestion that any of the Suite 803 proceeds ended up in 933 from another AMF source.  Therefore, there can be no conspiracy liability for Ali for these transfers.

## IV.      CONCLUSION

When all is said and done, it is fair to say that the AMF has unearthed a series of interesting, sometimes confounding and often suspicious transactions.  However, what it has not done is demonstrate to the requisite level of legal certainty that the claims asserted in this adversary arising out of those transfers create liability to the AMF for these Defendants. For that

reason, judgment will be given to the Defendants on all counts.

So ordered.

DATED: January 3, 2007

_____
CHARLES G. CASE II
UNITED STATES BANKRUPTCY JUDGE

**COPY** of the foregoing mailed by the BNC and/or
sent by auto-generated mail to :

OFFICE OF THE U.S. TRUSTEE
P.O. Box 36170
Phoenix, Arizona  85067-6170

Donald L. Gaffney
Steven D. Jerome
SNELL & WILMER L.L.P.
One Arizona Center
Phoenix, Arizona 85004-0001
Attorneys for the Arab Monetary Fund

Alan Meda
DYEKMAN, MEDA & CURTIS
6750 E. Camelback Road. Suite 104
Scottsdale, AZ 85251
Attorney for Three Defendants

Jafar Hashim
6730 East Valley Vista Lane
Paradise Valley, Arizona 85203
Pro per

_____